```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY
```

|  |  |  |
|---|---|---|
| | : | |
| GENERAL CATEGORY SCALLOP | : | |
| FISHERMEN, | : | CIVIL ACTION NO. 08-2264 (MLC) |
| | : | |
| Plaintiffs, | : | **MEMORANDUM OPINION** |
| | : | |
| v. | : | |
| | : | |
| SECRETARY OF UNITED STATES | : | |
| DEPARTMENT OF COMMERCE, | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**COOPER, District Judge**

    **APPEARANCES**

        Patrick F. Flanigan, Law Office of Patrick Flanigan,
Swarthmore, PA, for plaintiffs.

        Bradley H. Oliphant, United States Department of Justice,
Washington, D.C., for defendants.

        Plaintiffs, former general category scallop permit holders,
brought this action against the Secretary of the United States
Department of Commerce ("Secretary"), the National Oceanic and
Atmospheric Administration ("NOAA"), and the National Marine
Fisheries Service ("NMFS" and, collectively, "defendants").
(Dkt. entry no. 21, 2d Am. Compl. at 1.)  Plaintiffs challenge a
final rule issued by the NMFS on behalf of the Secretary,
Amendment 11 to the Atlantic Sea Scallop Fishery Management Plan,
73 Fed. Reg. 20090 (Apr. 14, 2008) (codified at 50 C.F.R. pt.
648) ("Amendment 11").  (Id. at 2.)  Plaintiffs allege that
Amendment 11 violates, inter alia, the United States

Constitution, the Administrative Procedures Act, and the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006 ("Magnuson-Stevens Act").[1]

Plaintiffs now move for summary judgment in their favor, pursuant to Federal Rule of Civil Procedure ("Rule") 56, seeking a judgment declaring Amendment 11 invalid and remanding Amendment 11 for development consistent with the law. (Dkt. entry no. 26, Pl. Mot. Summ. J.; dkt. entry no. 36, Pl. Notice of Re-filing; Pl. Br. at 4.) Defendants cross-move for summary judgment in their favor. (Dkt. entry no. 30, Defs. Cross Mot. Summ. J.; dkt. entry no. 37, Defs. Notice of Re-filing.) The Court held a hearing on January 27, 2010. The Court has reviewed the parties' written submissions, as well as the Administrative Record ("A.R."). For the reasons stated herein, the Court will deny the motion and grant the cross motion.

---

[1] The Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006 is codified at 16 U.S.C. § 1801 <u>et seq.</u> and subsumes the Magnuson-Stevens Fishery Conservation and Management Act of 2005. (<u>See</u> dkt. entry no. 26, Pl. Br. at 1.) The predecessor to the Magnuson-Stevens Act was first enacted in 1976 and confers federal management authority over marine fishery resources upon the Secretary and the NMFS, which is a subunit of the NOAA. Fishery Conservation and Management Act of 1976, Pub. L. No. 94-265, 90 Stat. 331 (1976); <u>see also</u> <u>Am. Pelagic Fishing Co., L.P. v. United States</u>, 379 F.3d 1363, 1367 n.1 (Fed. Cir. 2004); <u>Hall v. Evans</u>, 165 F.Supp.2d 114, 123-25 (D.R.I. 2001) (discussing background and framework of Magnuson-Stevens Act).

**BACKGROUND**

I.   **Magnuson-Stevens Act**

The Magnuson-Stevens Act delegates authority to the NMFS and the Secretary to manage and conserve coastal fisheries.  (Dkt. entry no. 30, Defs. Br. at 3; Pl. Br. at 3.)  The Magnuson-Stevens Act created eight Regional Fishery Management Councils ("Councils"), which prepare fishery management plans ("FMP") or FMP amendments and recommend implementing regulations for each fishery under their authority.  (Defs. Br. at 3; Pl. Br. at 3; dkt. entry no. 26, Joint Stmt. of Material Facts Not in Dispute at ¶ 2.)  See 16 U.S.C. §§ 1852, 1854.

The New England Fishery Management Council ("NEFMC" or "Council") has responsibility for recommending management measures for the Atlantic sea scallop fishery ("fishery").  (Defs. Br. at 3; Pl. Br. at 4.)[2]  See also 50 C.F.R. § 600.110(a); 69 Fed. Reg. 35194 (June 23, 2004).  Councils transmit the FMPs or amendments and proposed regulations to the Secretary for review.  (Defs. Br. at 4.)  See 16 U.S.C. § 1854.  After a public comment period, the Secretary, if appropriate, approves the FMP or amendment.  (Defs. Br. at 5; Pl. Br. at 3.)

---

[2] For purposes of the Magnuson-Stevens Act, "fishery" means either "one or more stocks of fish that can be treated as a unit for purposes of conservation and management and that are identified on the basis of geographic, scientific, technical, recreational, or economic characteristics, or method of catch," or "any fishing for such stocks."  50 C.F.R. § 600.10.

3

See 16 U.S.C. § 1854(a).  The Secretary publishes proposed regulations in the Federal Register, and, after a public comment period, promulgates final regulations.  (Defs. Br. at 5.)  See 16 U.S.C. § 1854(b).  FMPs, amendments, and rules implementing the same, must balance the needs of the fishery users against conservation goals, consistent with ten national standards listed in the Magnuson-Stevens Act.  (Joint Stmt. at ¶ 3.)  See 16 U.S.C. § 1851(a).

## II.  General Category Scallop Fishery Prior to Amendment 11

The management plan for the Atlantic Ocean scallop fishery was amended in 1994 to establish an "open access" scallop fishery.  See Amendment 4 to Atlantic Sea Scallop FMP, 59 Fed. Reg. 2757 (Jan. 19, 1994).  Under Amendment 4, the FMP provided for either a "limited access" or "open access general category" scallop permit, and it allowed holders of either type of permit to fish up to 400 pounds of Atlantic sea scallops per day.  (Joint Stmt. at ¶ 7; Defs. Br. at 4-5.)[3]

Vessels eligible for "limited access" permits under Amendment 4 were generally the large-scale scallop fishing boats, commonly referred to as "trip boats" because they remain at sea for several days at a time.  (See Pl. Br. at 29 n.17.)  Vessels

---

[3]  Not all days are permissible scallop fishing days.  The fishery is "open" or "closed" on specified days each quarter, and no vessels are permitted to take scallops on days when the fishery is closed.  That aspect of the implementation of the Act is not in issue in this case.

eligible for "general category" permits under Amendment 4 were either small-scale scallop fishing vessels, or vessels holding non-scallop fishing permits that would harvest scallops as incidental to their fishing catch.  See Advance Notice of Proposed Rulemaking, 69 Fed. Reg. 63341 (Nov. 1, 2004) (noting that the NEFMC's "original intent in establishing the general category scallop permit [program] implemented in 1994 . . . was to accommodate customary scallop bycatch in other fisheries and allow a flexible program for seasonal or opportunistic fisheries targeting inshore scallops").  Plaintiffs are all small-scale general category scallop fishermen who, prior to Amendment 11, were able to catch up to 400 pounds of scallops per day under their permits.

Participation levels in the general category scallop fishery rose under Amendment 4, and in response the NEFMC began to consider methods to limit that participation.  Those potential methods included limiting the eligibility criteria for future permits.  (Defs. Br. at 5-6.)  A "Notice of a Public Meeting" was published in the Federal Register on August 31, 2004, advising that NEFMC would hold a three-day meeting on September 14-16, 2004, "to consider actions affecting New England fisheries in the exclusive economic zone (EEZ)."  69 Fed. Reg. 53045 (Aug. 31,

2004).[4]  The notice advised that the scallop committee of the
NEFMC would receive management advice on issues including
"actions to cap or reduce general category scallop landings."
Id.  The agenda for the September 14-16, 2004 meeting advised
that with regard to the scallop fishery, "the following issues
may be discussed . . . actions to address overfishing . . . [and]
actions to cap or reduce general category scallop landings and/or
improve reporting measures. . . ."  (A.R. at 3165.)

During the NEFMC meeting, the vice-chairman of the NEFMC
stated his intention "to propose a motion to establish a control
date effective [on] publication of the Federal Register . . .
that would freeze the number of permits in the fishery."  (Pl.
Br. at 8; A.R. at 3493.)[5]  Although a participant at the meeting
objected to the NEFMC's taking this action because the agenda for
the meeting had not indicated that a control date would be

_____

[4] The Exclusive Economic Zone ("EEZ") of the United States
consists of the waters two hundred nautical miles from the
coastal boundary of each state.  16 U.S.C. § 1802(11);
Proclamation No. 5030, 48 Fed. Reg. 10605 (Mar. 10, 1983).  See
Am. Pelagic Fishing Co., 379 F.3d at 1366.  The United States
exercises sovereign rights and exclusive fishery management
authority over all fish within the EEZ.  16 U.S.C. § 1811(a).

[5] A control date is a "date established for defining the
pool of potential participants in a given management program"
that can "establish a range of years during which a potential
participant must have been active in a fishery in order to
qualify for a quota share."  (Defs. Br. at 16.)  See also Am.
Pelagic Fishing Co., 379 F.3d at 1367 n.3 ("A 'control date'
provides notice to anyone subsequently entering a fishery that he
is not assured of continued participation in the fishery should a
limited scheme be implemented.").

6

considered, the vice-chairman responded that "it defeats the purpose of the control date if you notify in advance." (A.R. at 3593-94.)  The NEFMC proceeded to vote on September 14, 2004, whether to publish a notice in the Federal Register. (A.R. at 3586-97.)  The motion that the NEFMC request that a control date be published in the Federal Register for the general category permit scallop fishery passed 13-1, with two abstentions. (A.R. at 3600.)

NMFS published a notice in the Federal Register on November 1, 2004, at the recommendation of the NEFMC, informing the public that it was considering further regulation of the scallop fishery. (Defs. Br. at 5.)  That "Advance Notice of Proposed Rulemaking" states in pertinent part:

> NMFS announces that it is considering, and is seeking
> public comment on, proposed rulemaking to control
> future access to the open access vessel permit category
> (general category) Atlantic sea scallop fishery if a
> management regime is developed and implemented under
> the Magnuson-Stevens Fishery Conservation and
> Management Act (Magnuson-Stevens Act) to limit the
> number of participants in this sector of the scallop
> fishery.  This sector of the fishery includes vessels
> with general category permits, as well as vessels with
> limited access scallop permits that land scallops while
> not on a scallop day-at-sea (DAS).  This announcement
> is intended, in part, to promote awareness of potential
> eligibility criteria for future access so as to
> discourage speculative entry into the fishery while the
> New England Fishery Management Council (Council)
> considers whether and how access to the general
> category sea scallop fishery should be controlled.  The
> date of publication of this notice, November 1, 2004,
> shall be known as the "control date" and may be used

<u>for establishing eligibility criteria for determining</u>
<u>levels of future access to the sea scallop fishery</u>
<u>subject to Federal authority</u>.

69 Fed. Reg. 63341 (Nov. 1, 2004) (emphasis added).

**III. Amendment 11 to the Atlantic Sea Scallop FMP**

Amendment 11 is an amendment to the FMP for the Atlantic Sea Scallop Fishery. (Defs. Br. at 6.) It "establishes criteria and authority for determining the percentage of scallop catch allocated to the general category fleet," and establishes an Individual Fishing Quota ("IFQ") permit system. 73 Fed. Reg. at 20090.

The NEFMC began to develop Amendment 11 in January 2006 to consider means of curtailing the amount of scallop landings by the general category fleet, and held 35 meetings between January 2006 and June 2007 to discuss alternatives to a limited access program for the general category vessels. <u>Id.</u> The NEFMC adopted a Draft Supplemental Environmental Impact Statement on April 11, 2007, which sets forth the proposed action and discussion of alternative actions considered, with rationales for preferred action. <u>Id.</u> (<u>See</u> A.R. at 12630 ("April 2007 DSEIS").) A Final Supplemental Environmental Impact Statement was submitted to NMFS on September 24, 2007. (A.R. at 13414 ("September 2007 FSEIS").)

The NEFMC adopted Amendment 11 on June 20, 2007, and a proposed rule for Amendment 11 was published in the Federal Register in December 2007 with a comment period ending in January

8

2008.  (Joint Stmt. at ¶ 10.)  See Proposed Rule and Request for
Comments, 72 Fed. Reg. 71315 (Dec. 17, 2007).  The NMFS approved
Amendment 11 on February 27, 2008.  (Joint Stmt. at ¶ 10.)  On
April 14, 2008, the NMFS published the final rule implementing
Amendment 11 in the Federal Register.  See 73 Fed. Reg. at 20090.
Amendment 11 became effective on June 1, 2008.  Id.

Amendment 11 decreases the number of vessels eligible to
participate in the fishery by abolishing the open access general
category fishery and replacing it with a "limited access general
category" ("LAGC") fishery.  See id.  Under Amendment 11's
restrictions, all vessels without a limited access permit must be
issued an LAGC scallop permit in order to land scallops in the
general category fishery.  See id.; 50 C.F.R. § 648.4(a)(2)(ii)
("Any vessel of the United States that has not been issued a
limited access scallop permit . . . that possesses, retains, or
lands scallops in or from Federal waters, must be issued an LAGC
scallop permit. . . .").

Amendment 11 provides for three types of LAGC scallop
permits:  individual fishing quota LAGC scallop permit ("IFQ
scallop permit"); Northern Gulf of Maine LAGC scallop permit
("NGOM scallop permit"); and incidental catch LAGC scallop permit
("incidental catch permit").  See 73 Fed. Reg. at 20090-91; 50
C.F.R. § 648.4(a)(2)(ii)(A)-(C).  An IFQ scallop permit allows
its holder to land up to 400 pounds of shucked scallop meats per

trip.  50 C.F.R. § 648.4(a)(2)(ii)(A).  An NGOM scallop permit
allows its holder to land up to 200 pounds of shucked scallop
meats per trip within the demarcated NGOM Scallop Management
Area.  50 C.F.R. § 648.4(a)(2)(ii)(B); id. at § 648.62.  The
incidental catch permit only allows landings of up to 40 pounds
of shucked scallop meats per trip.  50 C.F.R. §
648.4(a)(2)(ii)(C).

A vessel is eligible for an IFQ scallop permit if NMFS
records verify that the vessel landed at least 1000 pounds of
scallop meats in any fishing year between March 1, 2000, and
November 1, 2004, and a general category scallop permit had been
issued to the vessel during the fishing year in which the
landings were made.  See 73 Fed. Reg. at 20091; 50 C.F.R. §
648.4(a)(2)(ii)(D).  The IFQ is then calculated using a
contribution factor that considers the vessel's best year of
scallop landings during the qualification period and number of
years active.  50 C.F.R. § 648.4(a)(2)(ii)(E).

Vessel owners who cannot qualify for IFQ scallop permits can
apply for one of the other two types of LAGC scallop permits,
which have different restrictions.  See 73 Fed. Reg. at 20091; 50
C.F.R. § 648.4(a)(2)(ii)(F).  A vessel must have been issued a
general category scallop permit as of November 1, 2004, to
qualify for either an NGOM or incidental catch scallop permit.
Id.

10

Amendment 11 provides a process through which a vessel owner can administratively appeal denial of an LAGC scallop permit. See 73 Fed. Reg. at 20092; 50 C.F.R. § 648.4(a)(2)(ii)(O).  The only basis for appeal is that the information used by the NMFS to determine eligibility was incorrect.  50 C.F.R. § 648.4(a)(2)(ii)(O)(1).  A vessel denied an LAGC scallop permit may continue to fish for scallops, provided that the denial has been appealed, the appeal is pending, and the vessel has on board a letter from the NMFS authorizing the vessel to fish under the LAGC scallop permit category.  See 73 Fed. Reg. at 20092; 50 C.F.R. § 648.4(a)(2)(ii)(O)(4).  If the appeal is ultimately denied, the NMFS will send a notice of final denial to the vessel owner, and the letter of authorization becomes invalid.  See id.

Amendment 11 also allocates the scallop resource between the limited access fleet and the newly-created LAGC category.  The estimated scallop landings by vessels with incidental catch permits are first deducted from the annual projected scallop catch.  73 Fed. Reg. at 20093.  Five percent of the resultant total projected annual scallop catch is allocated to vessels with IFQ scallop permits.  Id.  The IFQs are therefore calculated, using a contribution factor based on previous historical scallop landings, from this five percent allocation.  Id.  Half a percent of the total projected annual scallop catch is allocated to limited access vessels that also fish with IFQ scallop permits.

11

Id.  The remaining 94.5 percent of the total projected annual scallop catch, after deduction of incidental catch, is allocated to the limited access scallop fishery.  Id.  The total allowable catch projected for the NGOM scallop management area is not included in the total allowable catch and allocations specified for the remainder of the fishery.  See 50 C.F.R. § 648.53(a); 50 C.F.R. § 648.62(b).

Amendment 11 explains that the NGOM scallop management area, defined as waters north of 42°20' and within the boundaries of the Gulf of Maine Scallop Dredge Exemption Area, is "managed separately, because the Council clarified that the fishery there has unique characteristics":

> The abundance of scallops in the NGOM fluctuates more
> widely, supporting sporadic fisheries, and scallops are
> confined to small "patchy" areas throughout the area.
> There are times and areas within the NGOM that have
> sufficient abundance of scallops in small areas to
> support a substantial fishery and other times and areas
> that do not.

73 Fed. Reg. at 20095; see also 50 C.F.R. § 648.62(a); 50 C.F.R. § 648.80(a)(11).  The plaintiffs here have expressed that they do not fish in the NGOM scallop management area and thus are not interested in the NGOM scallop permit.  (Dkt. entry no. 42, 1-27-10 Hr'g Tr. at 39:19-40:1.)

Most of the plaintiffs are ineligible for any LAGC scallop permit because they received their first general category scallop permit after the control date of November 1, 2004.  (Defs. Br. at

12

8.)  Thus, many of the plaintiffs have been unable to participate in the scallop fishery since the fishing year opened on March 1, 2010, for lack of an LAGC scallop permit.

## IV.  Plaintiffs' Causes of Action

The plaintiffs contend that "Amendment 11 contains narrowly drafted eligibility criteria requiring that a scallop permit holder before the control date (retroactively), have landed (harvested) at least 1,000 pounds of scallops in any year from March 1, 2000, through November 1, 2004" and that the use of this control date adversely impacted the plaintiffs, who do not qualify for LAGC permits under Amendment 11.  (Pl. Br. at 10.) The plaintiffs argue that the lack of advance notice that the NEFMC was going to implement a control date, and subsequent adoption of the retroactive control date, violates the standards for rulemaking under the Magnuson-Stevens Act and the Administrative Procedures Act ("APA"), as well as the plaintiffs' procedural due process rights.  (Id. at 11-15.)  Count I alleges a due process violation under the Fifth Amendment.  (2d Am. Compl. at ¶¶ 35-42.)  Count II alleges a regulatory taking without just compensation, also in violation of the Fifth Amendment.  (Id. at ¶¶ 43-49.)  Counts III and IV allege that the defendants violated the Magnuson-Stevens Act's requirements for implementing an IFQ program.  (Id. at ¶¶ 50-64.)

13

The plaintiffs also argue that the adoption of Amendment 11 violated the National Standards set forth in the Magnuson-Stevens Act, 16 U.S.C. § 1851(a), because the scallop resource is not overfished and because Amendment 11 favors fishermen in the Northern Gulf of Maine area over the rest of the fishery.  (Pl. Br. at 17-29.)  Count V alleges violation of National Standard 2, on the basis that Amendment 11 was not based on the "best scientific information available."  (2d Am. Compl. at ¶¶ 65-71.) Count VI alleges violation of National Standard 3, in that Amendment 11 does not manage the scallop resource "as a single unit throughout its range."  (Id. at ¶¶ 72-77.)  Count VII alleges that Amendment 11 impermissibly discriminates among residents of different States, as prohibited by National Standard 4.  (Id. at ¶¶ 78-84.)  Count VIII alleges that Amendment 11 has "economic allocation as its sole purpose," in contravention of National Standard 5.  (Id. at ¶¶ 85-89.)[6]

To the extent the plaintiffs assert a takings claim seeking just compensation for their scallop dredging equipment under the Fifth Amendment, plaintiffs' counsel explained at oral argument that if Amendment 11 is remanded as invalid, the takings claims are moot, and if Amendment 11 is found to be valid, the plaintiffs would seek individual damages hearings under the

---

[6] The plaintiffs have voluntarily withdrawn Counts IX and X of the Second Amended Complaint, without objection from the defendants.  (Pl. Br. at 29; 1-27-10 Hr'g Tr. at 3:7-12.)

Little Tucker Act, 28 U.S.C. § 1346(a)(2), which vests this Court with jurisdiction to adjudicate claims against the federal government for money damages up to $10,000.  (1-27-10 Hr'g Tr. at 24:21-26:2; 2d Am. Compl. at ¶ 10 (invoking jurisdiction, <u>inter alia</u>, under 28 U.S.C. § 1346).)

We note that the defendants argue that various plaintiffs lack standing to assert these claims, or in the alternative that their claims are unripe, primarily because certain plaintiffs had not concluded administrative appeals of their permit denials. (Defs. Br. at 9-14.)  However, it is apparent that the plaintiffs have standing to challenge Amendment 11 because they have alleged that it will cause them economic harm, and that this harm is caused by the defendants' enactment of Amendment 11.  <u>See</u> <u>N.C. Fisheries Ass'n, Inc. v. Gutierrez</u>, 518 F.Supp.2d 62, 80-82 (D.D.C. 2007) ("[R]estrictions imposed in [an FMP amendment] harm [plaintiffs] economically by limiting the number of fish that they can catch and sell.  Economic harm of this sort is a canonical example of injury in fact sufficient to establish standing.").  Amendment 11 took effect on June 1, 2008, and so the plaintiffs' challenge to it is now ripe for review.  The status of their administrative appeals is immaterial to their challenge to Amendment 11, because this action challenges the adoption and effect of Amendment 11 rather than the limited basis for administrative review of permit denials.  We thus find that

15

the plaintiffs have "asserted a present or expected injury that
is legally cognizable and non-negligible."  Huddy v. Fed.
Commc'ns Comm'n, 236 F.3d 720, 722 (D.C. Cir. 2001).

**DISCUSSION**

**I.   Applicable Legal Standards**

    **A.   Summary Judgment Standard**

The standard for a motion for summary judgment is well-
settled and will be briefly summarized here.  Rule 56(c) provides
that summary judgment is proper if the pleadings, the discovery
and disclosure materials, and any affidavits show that there is
no genuine issue as to any material fact and that the movant is
entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In
making this determination, the Court must "view[] the record in
the light most favorable to the non-moving party and draw[] all
inferences in that party's favor."  United States ex rel.
Josenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009)
(citing Abramson v. William Patterson Coll., 260 F.3d 265, 276
(3d Cir. 2001)).  If the Court determines, upon review of a
motion and a cross-motion for summary judgment, that no genuine
issue of material fact exists, "judgment may be entered in favor
of the deserving party in light of the law and undisputed facts."
City of Millville v. Rock, No. 07-1073, 2010 WL 199618, at *5
(D.N.J. Jan. 12, 2010).

16

**B.    Judicial Review of Administrative Actions Taken
       Pursuant to the Magnuson-Stevens Act**

16 U.S.C. § 1855(f) provides for judicial review of "actions
that are taken by the Secretary under regulations which implement
a fishery management plan." 16 U.S.C. § 1855(f)(2).  Such
actions, which undisputedly include the adoption of an FMP
amendment such as Amendment 11, "shall be subject to judicial
review to the extent authorized by, and in accordance with,
chapter 7 of Title 5." Id. at § 1855(f)(1).  Thus, the Magnuson-
Stevens Act incorporates the APA for the standard by which a
court is to review the administrative action.

Section 1855(f)(1)(2) further specifies that "the
appropriate court shall only set aside such regulation or action
on a ground specified in section 706(2)(A), (B), (C), or (D)" of
the APA.  16 U.S.C. § 1855(f)(1)(2).  That statutory provision
states that a reviewing court shall

> (2) hold unlawful and set aside agency action,
> findings, and conclusions found to be-
>
> > (A) arbitrary, capricious, an abuse of discretion,
> > or otherwise not in accordance with law;
> > (B) contrary to constitutional right, power,
> > privilege, or immunity;
> > (C) in excess of statutory jurisdiction,
> > authority, or limitations, or short of statutory
> > right;
> > (D) without observance of procedure required by
> > law. . . .

5 U.S.C. § 706.

17

The determination of the NMFS in adopting Amendment 11 is not shielded from a "thorough, probing, in-depth review." Citizens to Pres. Overton Park v. Volpe, 401 U.S. 402, 415 (1971).  Although the Court may not substitute its judgment for that of the NMFS, it may "consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Id. at 416. However, the scope of review under the APA is narrow and presumes the validity of action taken by the NMFS.  Id. at 415.  A certain degree of deference is due to a governmental agency, particularly on issues on which experts disagree, because the agency is expected to have expertise in its area.  See Marsh v. Or. Nat'l Res. Council, 490 U.S. 360, 378 (1989). "The Secretary's assessment of which fishery conservation and management measures would be in the nation's best interest is 'a classic example of a factual dispute the resolution of which implicates substantial agency expertise.'"  Ace Lobster Co., Inc. v. Evans, 165 F.Supp.2d 148, 165 (D.R.I. 2001) (quoting Nat'l Fisheries Inst., Inc. v. Mosbacher, 732 F.Supp. 210, 223 (D.D.C. 1990)).

The plaintiffs contend that the defendants violated both the procedural requirements for setting a control date for Amendment 11, and substantive requirements for taking into account national standards in creating an FMP and amendments, such that Section 706(A)-(D) are all implicated.

18

### 1.   Procedural Requirements

Under the APA, a "rule" is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency. . . ." 5 U.S.C. § 551(4). "'Agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." Id. at § 551(13). Amendment 11 is a final rule of the NMFS and constitutes agency action by the Department of Commerce, which has delegated its authority to NMFS. See C&W Fish Co., Inc. v. Fox, 931 F.2d 1556, 1558 & n.1 (D.C. Cir. 1991); Oceana, Inc. v. Evans, 384 F.Supp.2d 203, 209 n.2 (D.D.C. 2005).

The APA requires that "[g]eneral notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include . . . a statement of the time, place, and nature of public rule making proceedings. . . ." 5 U.S.C. § 551(b)(1). The notice must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." Id. at § 553(b)(3).

The Magnuson-Stevens Act states that the regional fishery management councils shall "conduct public hearings, at appropriate times and in appropriate locations in the geographical area concerned, so as to allow all interested persons an opportunity to be heard in the development of fishery management plans and amendments to such plans . . . the term 'geographical area concerned' may include an area under the authority of another Council if the . . . matters being heard affect fishermen of that area. . . ."  16 U.S.C. § 1853(h)(3).

Regional fishery management councils must provide "timely public notice of each regular meeting and each emergency meeting, including the time, place, and agenda of the meeting" such that the meeting is "wide[ly] publicized in the major fishing ports of the region (and in other major fishing ports having a direct interest in the affected fishery"; e-mail notification and website postings alone are not sufficient.  Id. at § 1853(i)(2)(C).  For regular, non-emergency meetings, "[t]he published agenda of the meeting may not be modified to include additional matters for Council action without public notice or within 14 days prior to the meeting date."  Id.

Regulations providing for public notice of regular meetings of the regional fishery management councils are codified at 50 C.F.R. § 600.135.  According to the regulations, a regional council must notify "local newspapers in the major fishing ports

20

within its region . . . of the time and place of the meeting."
50 C.F.R. § 600.135(c).  "Actions that affect the public . . .
must be taken in public."  <u>Id.</u> at § 600.135(f).

### 2.   Substantive Requirements

The Magnuson-Stevens Act provides that "[a]ny fishery
management plan which is prepared by any Council, or by the
Secretary, with respect to any fishery, shall . . . contain the
conservation and management measures . . . which are . . .
consistent with the national standards, the other provisions of
this chapter . . . and any other applicable law."  18 U.S.C. §
1853(a)(1)(C).  The national standards for preparing FMPs and
regulations promulgated to implement the same, require that:

> (1) Conservation and management measures shall prevent
> overfishing while achieving, on a continuing basis, the
> optimum yield from each fishery for the United States
> fishing industry.

> (2) Conservation and management measures shall be based
> upon the best scientific information available.

> (3) To the extent practicable, an individual stock of
> fish shall be managed as a unit throughout its range,
> and interrelated stocks of fish shall be managed as a
> unit or in close coordination.

> (4) Conservation and management measures shall not
> discriminate between residents of different States.  If
> it becomes necessary to allocate or assign fishing
> privileges among various United States fishermen, such
> allocation shall be (A) fair and equitable to all such
> fishermen; (B) reasonably calculated to promote
> conservation; and (C) carried out in such manner that
> no particular individual, corporation, or other entity
> acquires an excessive share of such privileges.

> (5) Conservation and management measures shall, where
> practicable, consider efficiency in the utilization of
> fishery resources; except that no such measure shall
> have economic allocation as its sole purpose.
>
> . . .

16 U.S.C. § 1851(a)(1)-(5).[7]  Advisory guidelines for each of the

national standards have been promulgated at 50 C.F.R. §§ 600.310-

355 "to assist in the development of fishery management plans."

16 U.S.C. § 1851(b).  A court's "task is not to review de novo

whether the amendment complies with these standards but to

determine whether the Secretary's conclusion that the standards

have been satisfied is rational and supported by the record."

C&W Fish Co., 931 F.2d at 1562.

    The Magnuson-Stevens Act provides discretionary authority

for the NMFS, in creating FMPs or amendments for any fishery, to

"establish a limited access system for the fishery in order to

achieve optimum yield," provided that the Council and the

Secretary take into account

> (A) present participation in the fishery;
> (B) historical fishing practices in, and dependence on,
> the fishery;
> (C) the economics of the fishery;
> (D) the capability of fishing vessels used in the
> fishery to engage in other fisheries;
> (E) the cultural and social framework relevant to the
> fishery and any affected fishing communities;

---

[7] National standards 6-10 are not at issue here.  See 16
U.S.C. § 1851(a)(6)-(10).

        (F) the fair and equitable distribution of access
        privileges in the fishery; and
        (G) any other relevant considerations.

16 U.S.C. § 1853(b)(6).

        C.   **Fifth Amendment**

        The Fifth Amendment to the United States Constitution states

that "[n]o person shall . . . be deprived of life, liberty, or

property, without due process of law; nor shall private property

be taken for public use, without just compensation."  U.S. Const.

amend. V.  The plaintiffs contend that Amendment 11 deprived them

of due process of law because they were not given notice and an

opportunity to be heard with respect to the control date selected

by NEFMC and ultimately adopted by NMFS.  (Pl. Br. at 5-14.)  The

plaintiffs further allege that Amendment 11 constitutes a

compensable taking under the Fifth Amendment because it deprived

them of the ability to participate in the scallop fishery.  (Id.

at 14-17.)

        1.   **Due Process**

        Due process under the Fifth Amendment requires that "notice

be reasonably calculated to inform parties of proceedings that

may directly and adversely affect their legally protected

interests."  California ex rel. Lockyer v. Fed. Energy Reg.

Comm'n, 329 F.3d 700, 706-07 (9th Cir. 2003) (citing Walker v.

City of Hutchinson, 352 U.S. 112, 115 (1956)).  Publication in

the Federal Register satisfies Constitutional due process

                                23

requirements.  Id. at 707; see also  44 U.S.C. § 1507 (stating
that publication in the Federal Register of a document is
"sufficient to give notice of the contents of the document to a
person subject to or affected by it").

Many of the provisions in the Magnuson-Stevens Act and APA
requiring public notice of agency action exist to protect due
process.  Constitutional due process thus affords a floor of
protection, to which the Magnuson-Stevens Act and APA provide
additional protection with greater requirements than the minimal
notice requirements.

### 2.   Takings Without Just Compensation

The Fifth Amendment's prohibition on takings without just
compensation "is designed to bar Government from forcing some
people alone to bear public burdens which, in all fairness and
justice, should be borne by the public as a whole."  Penn Cent.
Transp. Co. v. City of N.Y., 438 U.S. 104, 123 (1978) (quotation
and citation omitted).  Real property, personal property, and
intangible property may each be the subject of a takings claim.
Am. Pelagic Fishing Co., 379 F.3d at 1371.  A taking may occur by
either physical invasion or regulation.  Id.  A regulatory taking
occurs when "government action, although not encroaching upon or
occupying private property, still affects and limits its use to
such an extent that a taking occurs."  Id. (quotations and
citations omitted); see also Penn Cent., 438 U.S. at 122 n.25.

24

Only persons asserting a legally cognizable property
interest are entitled to just compensation under the takings
clause of the Fifth Amendment.  See Rogers v. Bucks County
Domestic Relations Section, 959 F.2d 1268, 1275 (3d Cir. 1992).
If a valid property interest is established, three factors
determine whether a government regulation constitutes a taking:
(1) the economic impact of the regulation on the claimant, (2)
the extent to which the regulation interferes with investment-
backed expectations, and (3) the character of the government
action.  Penn Cent., 438 U.S. at 124.

Holders of fishing permits issued pursuant to the Magnuson-
Stevens Act do not possess a valid property interest in such
permits.  See Am. Pelagic Fishing Co., 379 F.3d at 1373-75
(citing 50 C.F.R. § 648.4(k) and noting that because fishing
permits were neither assignable nor transferrable, and conferred
only non-exclusive fishing privileges, permit holder "did not and
could not possess a property interest in its fishery permits").
The court in American Pelagic further concluded that no property
right to use a vessel to fish exists independent of the
regulatory regime.  Id. at 1377, 1380 ("[U]se of . . . vessels to
fish in the EEZ . . . does not equate to a cognizable property
interest for purposes of a takings analysis.").

25

**II.   Legal Standards Applied Here**

    **A.   November 1, 2004 Control Date**

The plaintiffs argue that the NEFMC failed to abide by rulemaking procedures in deciding on and adopting a control date for Amendment 11, and that the control date violates their procedural due process rights.  The defendants respond that a control date "is not an FMP, an FMP Amendment, or any other type of final agency action that [is] subject to challenge under the Magnuson Act or the [APA]."  (Defs. Br. at 17.)  The defendants also contend that, to the extent the control date is an action subject to challenge under the Magnuson-Stevens Act insofar as it is part of Amendment 11, the NEFMC did provide sufficient notice to the public that the NEFMC was considering enacting a control date for the fishery.  (Id. at 18.)

We decline the plaintiffs' invitation to apply the definition of "rulemaking" to the NEFMC's decision on September 14, 2004, to request publication of a control date in the Federal Register.[8]  The agenda for the September 14-16, 2004 meeting of the NEFMC stated that the Scallop Committee would discuss, inter alia, "actions to cap or reduce general category scallop

_____

[8] As the defendants point out in their February 16, 2010 letter to the Court, if the mere announcement of a control date on September 14, 2004 was an agency action subject to review under the Magnuson-Stevens Act and the APA, it would be time-barred by the thirty-day limitations period in 16 U.S.C. § 1855(f)(1).  (Dkt. entry no. 39, 2-16-10 Letter at 4-5.)

landings." (A.R. at 3165.) During the discussion of whether to adopt a control date, the Council addressed whether it had the right to take action on a control date "without it being on the agenda." (A.R. at 3527.) Joel MacDonald, Regional Counsel for NOAA, advised the Council that a control date was "part of the general consideration of general category issues" that was one of the alternatives to be considered in dealing with enforcement of the daily possession limit, thus "fall[ing] within the general ambit of what was going to be discussed under this agenda item." (A.R. at 3315, 3527-28.) The Court finds no basis for invalidating the control date simply because the NEFMC passed a motion to request publication of an Advance Notice of Proposed Rulemaking in the Federal Register. See J.H. Miles & Co., Inc. v. Brown, 910 F.Supp. 1138, 1159 (E.D. Va. 1995) (determining that Mid-Atlantic Fishery Management Council is not an "agency" within the meaning of the APA and thus the Council's adoption of a particular policy setting commercial catch quotas could not violate the APA).

Insofar as the plaintiffs challenge the control date as part of Amendment 11, the Court finds that neither the plaintiffs' constitutional due process rights nor the procedural requirements of the Magnuson-Stevens Act and APA were violated. The "Advance Notice of Proposed Rulemaking," subtitled "notice of a control date for the purposes of controlling entry in the general

27

category Atlantic sea scallop fishery," was published in the Federal Register on November 1, 2004, three and a half years before adoption of the final rule on April 14, 2008.  See 69 Fed. Reg. 63341.  The plaintiffs were free to submit written comments expressing their views on the control date issue before the control date was finally adopted as part of Amendment 11.[9]  The NEFMC Regional Administrator sent a letter to all general category permit holders dated October 29, 2004, shortly before the November 1, 2004 Advance Notice of Proposed Rulemaking was published, advising that "November 1, 2004, shall be known as the 'control date' and may be used for establishing eligibility criteria for determining levels of future access to the general scallop fishery subject to Federal authority."  (A.R. at 12529 (emphasis added).)

The notice given in the August 31, 2004 Federal Register stating that the NEFMC would consider "actions to cap or reduce general category scallop landings" was sufficient notice to the public for the NEFMC to vote to publish notice of the proposed control date in the Federal Register in the first place.  See 16 U.S.C. § 1853(i)(2)(C).  The November 1, 2004 publication of the

---

[9] Several plaintiffs here did submit written comments regarding their positions on the use of a control date.  Appendix II to Amendment 11 compiles written public comments on the Amendment 11 DSEIS.  At least four named plaintiffs submitted written comments to the NEFMC in June 2007:  David Tedford, Stanley Pritchett, Denis Lovgren, and Jimmy Hahn.  (A.R. at 14172, 14202-04, 14220-21, 14238-39, 14298-14301.)

Advance Notice of Proposed Rulemaking further put the plaintiffs on notice that the NEFMC was considering adopting a control date. This is legally sufficient to comport with due process requirements, as the plaintiffs do not contend that they were legally entitled to personal notice.  See California ex rel. Lockyer, 329 F.3d at 707 ("Publication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance, except those who are legally entitled to personal notice.").

The November 1, 2004 Advance Notice of Proposed Rulemaking satisfies the procedure required by 5 U.S.C. § 551(b)(1) in that it gives the public notice of the "the time, place, and nature of public rule making proceedings" by inviting written comments and expressly stating:  "This announcement is intended . . . to promote awareness of potential eligibility criteria for future access so as to discourage speculative entry into the fishery while the [NEFMC] considers whether and how access to the general category sea scallop fishery should be controlled."  69 Fed. Reg. 63341.  The Advance Notice of Proposed Rulemaking also provides "a description of the subjects and issues involved" as required by 5 U.S.C. § 551(b)(3) in that it explains that the NEFMC may use a control date of November 1, 2004, in establishing eligibility criteria for determining levels of future access to

29

the fishery, but that NEFMC was considering alternatives.  The "Supplementary Information" to the Advance Notice of Proposed Rulemaking provides detailed background information regarding the increase in participation in the general category scallop fishery, and noting that "additional fishing by vessels that fish under general category rules has the potential to cause overfishing."  Id.  Thus, the notice states that NEFMC "may consider development of an amendment to the Atlantic Sea Scallop FMP . . . that could restrict access in the general category scallop fishery to control harvest capacity.  The control date is intended to discourage speculative entry into the general category scallop fishery while controlled access restrictions are considered by the Council."  Id. at 63341-42 (emphasis added).

Amendment 11 itself, in the form of the Final Rule, directly addresses the same issue of notice of the control date raised by the plaintiffs here.  Two general category scallop vessel owners submitted comment letters to NMFS during the comment period stating that "because they were not aware of the November 1, 2004, control date, they purchased vessels and/or scallop fishing equipment, investing substantial amounts of money into the fishery."  73 Fed. Reg. at 20099, Comment 19.  The commenters stated that NMFS should have informed them of the control date when they applied for general category scallop permits after November 1, 2004, and "expressed concern that Amendment 11 would

30

eliminate them from the fishery because they entered after the control date." Id.  NMFS responded:

> Not including the control date information on permit application packages does not invalidate the control date, nor does it warrant expansion of the limited access qualification criteria to include the period after the control date.  The control date was published in the Federal Register on November 1, 2004, announced to all permit holders, and posted on the NMFS Northeast Region's Web site.  It was also announced and discussed in various fisheries publications throughout the region (e.g., Commercial Fisheries News and National Fisherman, two of the most widely known publications for fisheries in the region and nationwide). Individuals that are engaged in a Federal fishery should be aware of the highly regulated nature of the industry.  While there is no legal requirement to establish a control date, the control date's purpose was to provide fishers with advance notice that they may not qualify for entry into, or full participation in, the general category scallop fishery, with the intent that individuals would not unduly invest in or rely on this fishing without full and fair warning of the consequences of a limited access fishery.  Based on the increase in catch and vessels demonstrated in the Amendment 11 FSEIS, it appears that even the period after the control date was viewed as an opportunity to fish for scallops and accrue income, even if temporary. Despite their knowledge of the control date, a large number of vessel owners entered the fishery because of the short-term profits that could be accrued.  This post-control date expansion of the fishery was a primary concern of the Council during development of Amendment 11.

Id. (emphasis added).

Thirty-five subsequent public meetings in various locations occurred following the November 1, 2004 Advance Notice of Proposed Rulemaking, allowing for comment on the development of

Amendment 11.  (A.R. at 13993-94.)  While a majority of these
meetings occurred within the New England region, two were held in
New Jersey and one in Newport News, Virginia.  (Id.)  The
Magnuson-Stevens Act contemplates that public meetings addressing
FMPs should occur "in the geographical area concerned," including
"an area under the authority of another Council if the fish in
the fishery concerned migrate into, or occur in, that area or if
the matters being heard affect fishermen of that area."  16
U.S.C. §§ 1852(h)(3).  While the NEFMC had primary authority over
managing the scallop fishery, and it is thus unsurprising that a
majority of the public meetings took place within the New England
region, the NEFMC also complied at least minimally with the
requirement that it hold meetings in areas outside New England,
as Amendment 11 would also affect fishermen in the Mid-Atlantic
region.  Id.  We therefore hold that the defendants' ultimate
adoption of a November 1, 2004 control date in Amendment 11 is
valid.

**B.    Implementation of Individual Fishing Quotas**

The plaintiffs challenge Amendment 11 on the basis that it
violates a requirement of the Magnuson-Stevens Act that an FMP
must "establish[] procedures and requirements for the review and
revision of the terms of any such [IFQ] program."  (Pl. Br. at
18.)  16 U.S.C. § 1853(d)(5), repealed by Pub. L. 109-479, §
106(a)(1) (2007).

At the time Amendment 11 was adopted as a final rule on April 14, 2008, 16 U.S.C. § 1853(d)(5) had been repealed.  The Magnuson-Stevens Act itself allows for review and revision of the terms of the IFQ program implemented by Amendment 11 by framework adjustments and further amendment.  (A.R. at 13512.)  See 16 U.S.C. §§ 1853(b)(12), 1853(c), 1854; 50 C.F.R. § 648.55 (framework adjustments to scallop fishery management measures); 73 Fed. Reg. at 20094 (discussing transition period to IFQ program).  In any event, the record indicates that the defendants did consider the factors set forth in 16 U.S.C. § 1853(d)(5) in adopting Amendment 11.  (See A.R. at 13923 (discussing compliance with IFQ requirements).)  J.H. Miles & Co., 910 F.Supp. at 1160. The Court will enter judgment against the plaintiffs and in favor of the defendants on the plaintiffs' Counts III and IV, which seek relief under the repealed statutory provision.

**C.   Qualification and Eligibility Criteria for LAGC Permits**

The Secretary, through NMFS, is authorized under the Magnuson-Stevens Act to limit access to a fishery in order to achieve the objectives of an FMP.  (A.R. at 13464-64.)  See 16 U.S.C. § 1853(b)(6).  FMPs "shall . . . contain the conservation and management measures . . . which are . . . necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to

33

protect, restore, and promote the long-term health and stability of the fishery." Id. at § 1853(a)(1).[10]

### 1. Rationale for Limited Access General Category Fishery

The September FSEIS sets forth the rationale for NMFS to change from an open access general category fishery to an LAGC fishery. (A.R. at 13464-66.) Two objectives of Amendment 11 were to "[e]stablish criteria to qualify a number of vessels for a limited entry general category permit," and to "[d]evelop measures to prevent the limited entry general category fishery from exceeding their allocation." (A.R. at 13464.) These objectives are secondary to the primary need recognized by Amendment 11, "to implement more effective management measures to control fishing mortality by the general category component of the scallop fishery." (A.R. at 13462.)

The NEFMC considered retaining the open access nature of the fishery versus limiting access, and concluded that limiting

---

[10] The plaintiffs suggest that Amendment 11 is invalid because the "scallop fishery is not and has not been over fished since at least 2006." (Pl. Br. at 20.) However, overfishing is not a requisite for establishing or amending an FMP. Here, Amendment 11 was undertaken "to improve the management of the general category scallop fishery and the scallop fishery overall," a legitimate objective aimed toward "promot[ing] the long-term health and stability of the fishery." 73 Fed. Reg. at 20108; 16 U.S.C. § 1853(a)(1). Notably, the plaintiffs do not bring a cause of action under National Standard 1, which states that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1).

access based on historical scallop landings data during the time
period March 1, 2000 through November 1, 2004, would achieve "the
primary goal of this amendment to control capacity and mortality
in the general category scallop fishery . . . as well as . . .
establish criteria to qualify a number of vessels for a limited
entry general category permit." (A.R. at 13466.) It considered
three alternatives for qualification criteria, each of which
required that a vessel had a permit before the control date:
landings of 100 pounds or more on any one trip during the
qualification time period; annual landings of 1,000 pounds or
more in one or more years during the qualification time period;
and annual landings of 5,000 pounds or more in one or more years
during the qualification time period. (A.R. at 13468.) The
NEFMC ultimately selected the 1,000 pound landings criteria "as
an amount that would be above an annual level of incidental
scallop catch while fishing for most other species." (Id.)

The September FSEIS further considered the effect that the
eligibility criteria, including the qualification time period
being limited to before the control date, would have on recent
participants in the fishery. (See A.R. at 13731.) The document
recognized that under the proposed eligibility criteria, 308
vessels that had a permit before the control date and were active
in the fishery would not qualify for an LAGC scallop permit
because their annual scallop landings were too low, and

35

approximately 119 vessels that did not have a permit before the control date but landed scallops in 2005 or 2006 under general category rules would also be disqualified from the LAGC fishery. (A.R. at 13738-40.)  Under the same criteria, 369 vessels would qualify for an LAGC scallop permit, including 241 vessels that participated in the general category scallop fishery in 2005 and 2006.  (Id. at 13742.)  "[A] majority of vessels that received their permits after the control date are from the Mid-Atlantic area, with 16 from North Carolina, 14 from New Jersey, 12 from Delaware, and the rest from the other states.  Most of these vessels have a high dependence on scallops for their fishing income."  (A.R. at 13732.)  The September FSEIS acknowledged that "control date criteria will have adverse economic impacts" on those vessels that did not have a permit before the control date and were active in the fishery.  (A.R. at 13691; see also id. at 13973.)

### 2.  National Standard 2

The plaintiffs object to the use of 1,000 pounds of historical scallop landings during an eligible fishing year as a criterion for an IFQ scallop permit, alleging that the landings data is not the "best scientific information available" as required by National Standard 2.  (Pl. Br. at 20-23.)  See 16 U.S.C. § 1861(a)(2) ("Conservation and management measures shall be based upon the best scientific information available.").

36

Amendment 11 uses "NMFS landings data from dealer reports . . .
to determine a vessel's eligibility for an IFQ scallop permit, a
qualified IFQ scallop vessel's best year of scallop landings, and
years active in the general category scallop fishery."  73 Fed.
Reg. at 20091.  The plaintiffs argue that the defendants knew
that the NMFS permit database contained errors, but declined to
correct the errors using Vessel Trip Reports ["VTR"] or dealer
datasets.  (Pl. Br. at 21-22.)

Data for scallop landings over a particular time period
constitutes "scientific information."  See 50 C.F.R. §
600.315(b)(1) ("Scientific information includes, but is not
limited to, information of a biological, ecological, economic, or
social nature.").[11]  To prevail on a claim challenging an
amendment to an FMP under National Standard 2, the plaintiffs
must demonstrate that "superior or contrary data was available
and that the agency ignored such information."  N.C. Fisheries
Ass'n, 518 F.Supp.2d at 85.  "It is well settled . . . that the
Secretary can act when the available science is incomplete or
imperfect, even where concerns have been raised about the
accuracy of the methods or models employed."  Id.

A review of the record indicates that the defendants did not
contravene National Standard 2 in deciding to utilize NMFS

_____

[11] A control date, in contrast, does not implicate
"scientific information," as urged by the plaintiffs.  (Pl. Br.
at 20.)

landings data from dealer reports to determine whether a vessel
met the 1,000-pound landings criterion.  As an initial matter,
Amendment 11 expressly authorizes administrative review of IFQ
scallop permit denials "on the grounds that the information used
. . . was incorrect."  73 Fed. Reg. at 20092.  Thus, Amendment 11
does not preclude the use of what the plaintiffs might consider
to be the "best scientific information available."  Additionally,
the plaintiffs' only argument as to "best scientific information"
is that NMFS should consider "the actual fisherman's VTR and
dealer files."  (Pl. Br. at 22.)  The NEFMC Regional
Administrator convened a Fishery Management Action Team to
consider data quality issues, and disclosed that there were also
"many errors in both VTR and dealer datasets."  (A.R. at 12545.)
Thus, the plaintiffs have demonstrated neither the existence of
superior data, nor that the defendants ignored such data.
Judgment will be entered against the plaintiffs and in favor of
the defendants on the plaintiffs' Count V.

> **D.   Separate NGOM Scallop Permit**

The plaintiffs object to Amendment 11's separate provisions
for the NGOM scallop management area.  They challenge Amendment
11 for failure to conform to National Standard 3, which requires
that "[t]o the extent practicable, an individual stock of fish
shall be managed as a unit throughout its range," and National
Standard 4, which states that "[c]onservation and management

38

measures shall not discriminate between residents of different
States." 16 U.S.C. § 1851(a)(3)-(4).   The plaintiffs allege
that Amendment 11 arbitrarily treats vessels above 42°20' north
latitude differently from those below it.  (Pl. Br. at 23-24.)

### 1.   National Standard 3

The defendants respond that the NEFMC and NMFS "had a
reasoned basis for implementing a different management scheme"
for the NGOM fishery, noting that Amendment 11 recognized that
the NGOM has "unique characteristics," including being more
sporadic and "patchy" in abundance than other areas.  (Defs. Br.
at 29.)  See 73 Fed. Reg. at 20095.  The defendants further point
out that the guidelines for National Standard 3 permit
differentiation in management wherein a fishery may be managed as
"management units," defined as "a fishery or that portion of a
fishery identified in an FMP as relevant to the FMP's management
objectives."  (Defs. Br. at 29.)  50 C.F.R. § 600.320(d).

The September FSEIS explains the NEFMC's rationale for
deciding that Amendment 11 would utilize a separate management
system for the NGOM area:

> First, most of the landings from the NGOM area
> designated by the Council were from Maine state waters
> so management in the EEZ component of the fishery needs
> to be as compatible with state management regulations
> as possible.  Second, this fishery was traditionally
> fished, to a very large extent, by small boats that
> were engaged in other fisheries such as the lobster or
> groundfish fisheries during different seasons and that
> fish only seasonally for scallops.  As a result, the

39

> Council considered local access to the scallop resource
> by small vessels important to the continuation of
> fishing communities in Maine[,] New Hampshire and
> Massachusetts.

(A.R. at 13421.)  According to the guidelines for National
Standard 3, the decision to utilize management units within an
FMP for a single stock may be based on biological, geographic,
economic, technical, social, or ecological reasons.  50 C.F.R. §
600.320(d)(i)-(vi).  The reasons given in the FSEIS and the final
rule are biological (different and more sporadic abundance),
geographic (the biological differences occur in a specific
geographic area), economic (the general category scallop
fishermen in the NGOM tend to fish for scallops incidentally to
lobstering or groundfish efforts), and social (the NGOM fishery
tends to fish only seasonally for scallops).  Another reason
Amendment 11 treats the NGOM differently is to streamline
integration with state management regulations, an objective
endorsed in the guidelines for National Standard 3.  See 50
C.F.R. § 600.320(c) ("Cooperation and understanding among
entities concerned with the fishery (e.g., Councils, states,
Federal Government . . . ) are vital to effective management.").

Because Amendment 11 adequately documents why it was
practicable to treat the NGOM as a separate management unit, we
conclude that the plaintiffs have not proved that it was
arbitrary or capricious for the defendants to adopt Amendment 11
as compliant with National Standard 3, and the plaintiffs cannot

prevail on their claim as to National Standard 3.  See S.
Offshore Fishing Ass'n v. Daley, 995 F.Supp. 1411, 1429 n.27
(M.D. Fla. 1998) (granting summary judgment in favor of
defendants on claim based on National Standard 3 where Secretary
was pursuing all practicable measures to achieve preferred
conservation regime, including, as an interim measure, managing
three classes of shark species according to the gear-specific
fishery that targets them).  Judgment will be entered against the
plaintiffs and in favor of the defendants on the plaintiffs'
Count VI.

### 2.  National Standard 4

The plaintiffs allege that Amendment 11 violates National
Standard 4 because the NGOM scallop permit and incidental catch
permit are mutually exclusive, yet allocate up to 200 pounds of
scallops per day to NGOM permit holders while only allowing
incidental catch permit holders to harvest up to 40 pounds per
day, and this only if the vessel is fishing for other species.
(Pl. Br. at 27.)[12]  Thus, the plaintiffs allege that the
allocation between NGOM scallop permit holders and incidental
catch permit holders is not "fair and equitable," as required by

_____

[12] The plaintiffs also claim in Count VI that the defendants
violated National Standard 3 by holding just three of the thirty-
five public meetings within the Mid-Atlantic region.  (Pl. Br. at
25-27.)  The Court noted above that the defendants complied with
the procedural and substantive requirements of the Magnuson-
Stevens Act and the APA with regard to public meetings and
opportunities for comment.  See supra at 31-32.

16 U.S.C. § 1851(a)(4)(A), and it gives NGOM permit holders an excessive allocation over the incidental catch permit holders, which is barred by 16 U.S.C. § 1851(a)(4)(C).  See also 50 C.F.R. § 600.325(a).

The defendants contend that the final rule adopting Amendment 11 "explained that the higher possession limit [for the NGOM permit] in concert with the daily trip limit would 'establish scallop fishing controls appropriate for the fishery while protecting the resource in the area from overharvest, if and when scallops are present in the area.'"  (Defs. Br. at 31-32 (quoting 73 Fed. Reg. at 20095).)  The defendants point to the guidelines for National Standard 4 providing that "[a]n allocation of fishing privileges should be rationally connected to the achievement of [optimum yield] or with the furtherance of a legitimate . . . objective."  (Defs. Br. at 31.)  50 C.F.R. § 600.325(c)(3)(i)(A).  According to the defendants, the NEFMC's recognition that the NGOM resource's size, nature, and unpredictability, as well as its historic status as a small-vessel, seasonal fishery, "justified a different management scheme," including setting different landings limits.  (Defs. Br. at 31-32.)

Amendment 11 contemplates that the NGOM not only be managed separately from the rest of the fishery, but that its total allowable catch limits for each quarter also be set separately

42

from the rest of the fishery and, accordingly, that the NGOM management unit be closed when that limit is reached.  Thus, we find that the higher scallop landings limit per trip, combined with the separate total allowable catch, is justified as a response to the fact that abundance varies more greatly in the NGOM than the rest of the scallop fishery.  The NGOM scallop permit holders are treated differently than incidental catch permit holders not only as to the landings per trip, but also the number of trips per year.  We find that the landings limit for NGOM scallop permit holders is not comparable to the landings limit for incidental catch permit holders, because the total allowable catch and trips per year will differ.[13]  The mere fact that Amendment 11 provides the NGOM scallop permit a higher landings limit per trip does not compel the inference suggested by the plaintiffs that Amendment 11 is not "fair and equitable," nor that it necessarily allocates fishermen in the NGOM an excessive share of the scallop resource.  See Hadaja, Inc. v. Evans, 263 F.Supp.2d 346, 355 (D.R.I. 2003) ("[R]egulations that result in minor discriminatory impact do not automatically violate National Standard Four. . . . the Committee's belief that such a scheme would benefit the overall fishery to the

---

[13] The plaintiffs have not suggested that the ultimate total allowable catch per year will be disproportionate in the NGOM as compared to the rest of the scallop fishery.

43

(unfortunate) detriment of certain fishermen . . . is neither arbitrary, nor capricious, nor contrary to law.").

In response to a written comment that Amendment 11 "was created solely for residents of Maine, and that the NGOM Scallop Management Area is inconsistent with National Standard 4," the final rule noted that the

> NGOM Scallop Management Area does not base any measures on being a resident of the State of Maine.  Although the area is adjacent to the entire coast of Maine and may attract more Maine fishers, it also includes waters off of Massachusetts and New Hampshire.  Furthermore, any LAGC vessel could fish in the NGOM Scallop Management Area under Amendment 11.  The area is a special management area . . . which aims to prevent overharvest of a unique portion of the scallop resource and was designed to allow additional fishers to qualify to fish in the area that may not have qualified for the IFQ scallop permit.  The NGOM Scallop Management Area measures are therefore consistent with National Standard 4.

73 Fed. Reg. at 20103.  Thus, in addition to the Secretary having a rational basis for adopting separate management measures for the NGOM, it is questionable whether the plaintiffs could even invoke National Standard 4's prohibition on "discriminat[ing] between residents of different States."  16 U.S.C. § 1851(a)(4); see Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1460 (9th Cir. 1987) (finding that FMP amendment did not violate National Standard 4 because it would benefit all fishermen using a certain type of gear, not just Alaska residents, even though some discriminatory impact might occur, and because the

regulations were "tailored to solve a gear conflict problem and
to promote the conservation of sablefish"); <u>Hadaja, Inc.</u>, 263
F.Supp.2d at 355, 357 (rejecting challenge to FMP based on
National Standard 4 where management measures did "not
discriminate against fishing vessels based on their locality or
homeport," and record did not suggest that committee specifically
sought to exclude Rhode Island fishermen to the advantage of New
York or New Jersey fishermen, where some fishermen from the
latter two states were also excluded from the fishery).  Because
Amendment 11 does not exclude the plaintiffs from eligibility for
a NGOM scallop permit on the basis of their home state, and the
NGOM scallop permit is available to fishermen of all states, we
conclude that Amendment 11's separate management measures for the
NGOM do not violate National Standard 4.  (<u>See</u> A.R. at 13912.)

### E.   Allocation of Scallop Resource Between General Category and Limited Access Fleets

The plaintiffs contend that Amendment 11 violates National
Standard 4 by unfairly allocating the scallop resource between
the limited access fleet and the general category fleet.  (Pl.
Br. at 28-29.)  The plaintiffs also invoke National Standard 5,
which states that an FMP "shall [not] have economic allocation as
its sole purpose."  16 U.S.C. § 1851(a)(5).  The plaintiffs argue
that because Amendment 11 does not otherwise regulate the limited
access fleet, it "merely redistributes the scallop resource to

45

increase the harvest allocation for the [limited access] vessels."  (Pl. Br. at 28-29.)

      1.   **National Standard 4**

    Amendment 11 allocates ten percent of the total projected annual scallop catch to the general category fishery while the IFQ program is being implemented, and five percent thereafter. 73 Fed. Reg. at 20093-94.  The remainder of the scallop resource is allocated to the limited access fleet.  <u>Id.</u>[14]  The final rule explains, in response to a comment that Amendment 11 "may be inconsistent with Federal laws mandating equal treatment of permit holders," that Amendment 11 was designed to "maintain a fleet made up of relatively small vessels, with possession limits to maintain <u>the historical character of the fleet</u>," including provisions "to promote the continued operations of small operations."  73 Fed. Reg. at 20097 (emphasis added).  To ensure that no particular individual, corporation, or other entity acquires an excessive share of the scallop resource, Amendment 11 includes a provision to prevent a vessel from having more than 2 percent of the total allowable catch allocated to all IFQ scallop permit vessels combined, and an individual may own only up to 5 percent of the total allowable catch allocated to all IFQ scallop permit vessels.  (A.R. at 13813.)  73 Fed. Reg. at 20097.

---

[14] 0.5% of the allocation to the general category fishery is further allocated to limited access vessels that also have IFQ permits.  73 Fed. Reg. at 20093.

The five percent allocation of the total allowable catch to
the general category scallop fishery is based on historical
landings data, and does not suggest unfairness or arbitrariness
in the allocation.  In response to a complaint that Amendment 11
violates National Standard 4 by allocating a disproportionately
high share of the scallop resource to the limited access fleet,
the final rule stated:

> Amendment 11 developed an allocation for the general
> category fleet that is consistent with the historical
> average catch while allowing some expansion to account
> for the growth in the fishery.  Limited access vessels
> have been allocated the majority of the scallop catch
> through [days-at-sea] and access area trips.  To
> allocate substantially more scallop catch than the
> historical average to the general category fleet would
> not be equitable because it would not be consistent
> with catch in the limited access fishery or the general
> category fishery.

73 Fed. Reg. at 20100.  The final rule further notes that while
the historical average for the general category's share of
scallop landings is about 2.5 percent, the defendants analyzed a
range of allocations ranging from 2 percent to 11 percent of the
total scallop catch and recommended the 5 percent allocation in
order to allow some growth from historical fishing levels in the
general category fishery.  73 Fed. Reg. at 20101.

We find that the allocation of 5 percent of the scallop
catch to the LAGC permit holders does not contravene National
Standard 4.  The purpose of the allocation is to control capacity
and mortality in the general category fishery, which the

47

defendants determined, after considering several alternatives, would be best achieved in conjunction with a limited access program and trip possession limits by determining the maximum harvest by the general category fleet.  (A.R. at 13650-51, 13665.)  Because the allocation is based on historical landings data and provides for a slightly higher than average participation in the fishery by the general access fleet, it is fair and equitable, without conferring an excessive share of privileges to the limited access fleet.  We find that this allocation, as a management measure to control capacity and mortality in the general access fishery, is "reasonably calculated to promote conservation."  16 U.S.C. § 1851(a)(4); 50 C.F.R. § 600.325(c)(3)(i)(B) ("An allocation need not preserve the status quo in the fishery to qualify as 'fair and equitable,' if a restructuring of fishing privileges would maximize overall benefits."); see Hall v. Evans, 165 F.Supp.2d 114, 139 (D.R.I. 2001) (holding that trip limits designed to reflect each sector's historic level of participation in the fishery were consistent with National Standard 4).  Judgment will be entered against the plaintiffs and in favor of the defendants on the plaintiffs' Count VII.

### 2.  National Standard 5

In order to prevail on their claim based on National Standard 5, the plaintiffs must show that the Secretary failed to

consider any non-economic objectives in promulgating Amendment
11.  <u>Alaska Factory Trawler Ass'n</u>, 831 F.2d at 1460.  However,
the record shows that the defendants did take into account
objectives other than economic allocation in adopting the 5
percent general category allocation.  The September FSEIS states
that Amendment 11 "is primarily intended to control mortality in
the general category fishery and do so in the most equitable and
efficient way possible while maintaining the historical character
of the fishery."  (A.R. at 13913.)[15]  Amendment 11 was a response
to the "relatively rapid and large increase in the size of the
active general category fleet," which caused concern that

> the level of general category fishing continually
> exceeded the estimated level of fishing that was
> incorporated into annual management measures that were
> designed to achieve target fishing mortality rates.
> By exceeding the estimated catch, the unconstrained
> general category fishery was a threat to meeting the
> fishing mortality targets and the Magnuson-Stevens Act
> requirement to prevent overfishing.

73 Fed. Reg. at 20098.  "Amendment 11 recognizes that, without
controls on the number of participants, the general category
fleet can expand, especially when the resource conditions are

---

[15] "The historical character of the fishery" appears to
refer to the fact that the general category fleet historically
landed a small percentage of the overall scallop catch and that
the amount of general category permits issued increased
dramatically vis-a-vis the limited access fleet.  (<u>See, e.g.</u>,
A.R. at 13574 (noting that the number of general category vessels
increased 44% between 1994 and 2005, compared to a 1.3% decrease
in limited access permits during the same period).)

very good. . . . [which] could contribute to overfishing if combined with the full utilization of limited access effort."  73 Fed. Reg. at 20098.

By setting an allocation of five percent for LAGC vessels, the defendants were able to avoid other types of controls such as an overall "hard" total allowable catch that would have promoted "derby and unsafe fishing conditions," i.e., a "race to fish" within the general category fleet.  73 Fed. Reg. at 20098.  (See also A.R. at 13758, 13639.)  Because the record indicates that the Secretary considered non-economic objectives for the allocation, the Court will enter judgment in favor of the defendants and against the plaintiffs on the plaintiffs' Count VIII.

### F.   Takings Claim as to Scallop Dredge Equipment

The plaintiffs contend that they suffered an unconstitutional taking without just compensation at the hands of the defendants when they "expended money to purchase or re-rig fishing vessels and purchased unique fishing gear under known regulations" and were "issued a valid scallop permit that was later revoked by imposition of completely new regulations that could not be known at the time of the investments."  (Pl. Br. at 16.)  Although the plaintiffs argued in their moving papers that they had a constitutionally-protected property interest in both their vessels and the unique fishing gear used in scallop

50

fishing, at oral argument plaintiffs' counsel indicated that they were seeking individual hearings to determine the value of the scalloping gear only.  (See id. at 16-17; 1-27-10 Hr'g Tr. at 24:21-26:2.)

The applicable case law does not support the plaintiffs' contention that they are entitled to compensation under the Fifth Amendment for their scalloping gear.  See Conti v. United States, 291 F.3d 1334, 1343 (Fed. Cir. 2002) (holding that ban on drift gillnet swordfish fishing in FMP and implementing regulations did not constitute a taking of either fisherman's fishing permit, vessel, or gillnet gear, and agreeing with Court of Federal Claims's finding that plaintiff's "continuing ability to sell the vessel and the gear, fish in a different fishery, or put both the nets and the vessel to other uses . . . precluded a finding that a regulatory taking had occurred") (internal quotation omitted); see also Am. Pelagic Fishing Co., 379 F.3d at 1381 ("Because the right to use the vessel to fish in the EEZ was not inherent in its ownership of [its vessel], American Pelagic did not suffer the loss of a property interest for purposes of the Takings Clause when its Atlantic mackerel and herring permits were revoked.").  Accordingly, judgment will be entered in favor of the defendants as to plaintiffs' Counts I and II.

**CONCLUSION**

While we are sympathetic to the plight of the plaintiffs, the narrow scope of review under the Magnuson-Stevens Act and APA precludes the Court from granting the plaintiffs the relief they seek.  The Court, for the reasons stated supra, will deny the plaintiffs' motion for summary judgment and grant the cross motion.  The Court will issue an appropriate order and judgment separately.


        s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge


Dated: April 14, 2010

52